Carlson, good morning. Good morning, your honors. You've reserved five minutes for rebuttal? Yes. And you obviously are familiar with our lighting arrangements here? Yes, I am. Okay, so you can begin whenever you're ready. This is the patent case where the inventor discovered that if he placed fins inside of an electrical jack, projecting inwardly, he could change the impedance of the jack to make it match the impedance of the surrounding electronics. And in this way, the signal would not be distorted when it went through the jack. And in the patent, when a fin is matching impedance, that is then called a waveguide. The problem we have here is that the parties presented to the jury different ways to test if something is a waveguide, and the jury just did not know what test to use. Can I just, for clarification, you're saying a fin is a waveguide, is that also a projection? Because those three terms seem in some context to be used interchangeably. Not exactly. Fin and projection can be used interchangeably. If they are providing impedance matching, then they're a waveguide. You might have a fin in a jack, but it doesn't provide impedance matching. So a waveguide is the conclusion you'll get if you have impedance matching. And as I said, the problem was the jury didn't know how to decide this. And our first point we want to make is that this was something that was up to the judge to instruct the jury on if it was going to go to the jury on factual issues. But what exactly would you have the judge instruct them on? I mean, what would be, you're saying this should have been part of claim construction, the test. What test would you have advocated? The judge should have instructed per the test shown in the patent that in order to decide if something is a waveguide, you test the jack that has the fin in it. You take the fin out of the jack and you test it again. And if the return loss is better with the fin than without, you have a waveguide and you have infringement. Well, you're saying that the testing methodology is a part of the claim. I am. Well, when's the first time you raised that with a trial court and suggested that a specific testing methodology should be a part of your claim construction? I looked at your Markman brief. I couldn't find it. Yes. Well, that's a very important point. The fact is that the first time we raised this was as we were getting ready for trial. Because in the Markman hearing, it was not raised by the defendants. They did not say, we don't infringe because we use a different test and our test shows non-infringement. So the test to be used was not an issue at the Markman. We then took a look at their submissions and what they were going to offer as exhibits and what they were going to offer as expert reports. And it became pretty clear that they were going to repackage the arguments that they'd made under Markman in terms of the test now that you use to decide if something is a waveguide. So you're absolutely right. It didn't come up prior to trial. So we've filed motions in limine. OK. So you raised it by motion in limine to exclude the evidence. But did you ever suggest in anything called to the court's attention up to the time the trial started, we'll use that as a point, did you ever suggest to the trial judge, we've got to, what this really is is a claim construction issue and the patent provides a methodology for testing that should be a claim limitation. I can't find that if you'd point me to it. You're right. It's not there. And the reason it's not there is that the court order said that the parties had to identify the issues. We had to identify the reasons why they say they didn't infringe. And they did not say they did not infringe because they used a different test than the test shown in the patent. So nobody knew that that was an issue. All right. Let's assume just for a moment based upon what you just said to me that you raised the issue through the motion in limine to some extent that the court should have been addressing this, imposing this limitation. Where in the patent does it specify this testing methodology? What column? I saw there's a figure in there where you refer to that shows testing. But where would I find this testing methodology spelled out? The one ordinary skilled in the art would say, OK, there it is. This should be a claim limitation. That's at column nine. And with respect to the figure, it was figure 26. And this would be at A85 of the appendix, correct? What lines there? I've got a copy of the patent here in front of me. What lines are you referring to the testing methodology? It begins at about lines eight through about 19. OK. That's the part I had circled. I just want to make sure that I wasn't missing something. Thank you. But the point about this testing is that what it said was that you wanted to test the, quote, jack with fins, end of quote, against the, quote, jack without fins, end of quote. And that's what the case is about. That's what the patent is about. The patent is about the fact that he discovered that fins help. So the question is, well, what is the data with the fins? And what is the data without the fins? Let me tell you what we did to try to assess exactly what the patent said. What we did was we took the jack, the infringing jack, and we measured the return loss. Then we opened up the cover and we carefully milled out or carved off the fins, not changing anything else in the jack besides the fact we took out the fins. We put the cover back on and we tested it. And what we found is that the fins help. Now, they did the same test as soon as they got sued. Not any other test that they advocated before the jury. They did that test. And their testing showed that the fins help. Mr. Carlson, you performed the test that you contend was mandated by the claim, correct? But your contention is that you should have had the benefit of the district court saying to the jury, ladies and gentlemen of the jury, this is the only way this thing can be tested. Is that what you say was done? This is the way the patent shows. I don't know if there is another way or not. Nobody was advocating another way that made any sense. For purposes of this litigation, you wanted the judge to say, this is the way the test has to be done. Yeah. And of course, that's in accordance with the cases we cited in our brief. We couldn't find any cases where the parties disagreed about the test to be used. And the matter was then submitted to the jury. I mean, your argument seems a bit counterintuitive to me. So maybe you can help me out. It seems to me that it conflates infringement and claim construction to the extent that, sure, if the accused device is identical to the patented device, then the fins are going to have the same effect under the same circumstances. The confusion here or the question here arises because the accused device is different from the patented device. And that the slots do have some impact, or at least one could argue the slots have some impact. So why should that be ignored? You're saying ignore, for purposes of infringement, ignore everything about the accused device that makes it different from the patented device. Why? Well, first of all, what you have to look at is what the claim says. The claim doesn't say anything about PCBs. It doesn't say anything about the things that are different. The claim was the same as their device with the issue of what is a waveguide. Everything else about the claim read right on their device. But the court construed a waveguide to mean a structure for tuning impedance in an electrical device for pedicuring. You don't disagree with that, right? No, I don't. It doesn't go as far. So isn't whether or not the alleged infringing jack tunes impedance and it's a factual question for the jury? No, because the issue was what test to use. That was front and center, the issue that was about the trial. That was it. There wasn't a need for a trial, except for that issue, and it was legal. Because once you identify that as the test, there's no dispute about the fact that those fins helped in the defendant's structure. It made impedance matching better, and for that reason they were waveguides. And you had the opportunity to put on whatever merits you wanted to demonstrate that the test you were proposing was an appropriate test for reaching the result, right? Yes, we put that on. It was uncontroverted, and we put on the testing that they had done as well on the same test, which showed the same effect. Carlson, if we, say, disagree with your argument that the patent compelled the particular test you conducted, but we say, nevertheless, ADC did put on the test that it felt was the correct test, the question then becomes, did you establish, by preponderance of the evidence, infringement through that test, correct? Yes. Okay. Now, there are a number of arguments sort of flying around the briefs here, but it does seem that, it strikes me that the argument that the other side makes, or one of its arguments in support of the denial of JMOL, was that your test was deficient, because when you took out the tabs or the fins, whatever you want to call them, there wasn't compensation for the slots. You didn't fill in the slots also. You understand what I'm talking about? Yes. Now, there does seem to be expert evidence making that point. I could read the citations from the record. I mean, you know them as well as I do. And that point also presented the jury a closing argument. Isn't that, whether or not I would think it's the best way or you would think it's the best way, isn't that substantial evidence to support the jury verdict, that testimony? No, because it still goes back fundamentally to the legal issue of how you interpret that document. Wait a minute, but what if we disagree with you on that? What if we say, and we have to talk in hypotheticals at oral argument, but assume one were to conclude- That it's a fact issue. That it's purely a fact issue. Let's assume that. In fact, our brief says that even if it's regarded as a fact issue, that we would prevail as a JMOL. And the point there is that their test can't be accepted. Now, regarding our test, and if I have time, I'll talk about their test. But regarding our test, the first thing they said was, look, when you guys take out the fin, you have created a slot or have an open slot. We didn't create any slots by taking out the fin. Those slots were there in that commercial product. And in other places in their brief, they admit that. So it's not like we created anything. When we take out a fin, there's empty space there, just like in the patent. If you take out a fin, you end up with empty space. Do you have a slot? Yeah, you got a slot. But you had a slot in the first place. And the whole patent is about what is the effect of the fins. Now, if you test a jack with a fin against a jack with a fin removed, and change the slots, and change other things, you don't have a comparison of a jack to no jack. Let me ask you this. You've got variables in there. You're making a very good argument. I'm not sure that... I'll have to be honest. I'm not sure that I follow all of the science in the case. But there was an argument made on the other side. I guess the two experts were Dr. Nixon and Dr. Cooper. And the Cooper argument is, and it's laid out in the transcripts, as to why you did have to take out the slots. And, you know, we're just looking at it from the standpoint of whether there's substantial evidence that a reasonable jury could believe. And the difficulty I have is, I can't say that a reasonable juror could not have believed the Cooper testimony. That's the difficulty for me. The answer is, because while it may be a factual issue, we still have to look to what the patent is about. And the patent is about whether fins are doing something. And if you compare a jack with fins to a jack without fins, and without this, and that, and that, you don't have something that isolates on the fins. And you cannot draw any conclusions about what the fins are doing. What's more, there's another reason. Of course, the patent says to test the, quote, jack without fins. And to quote, it doesn't say, quote, jack without fins. And all the other things that I put in there on account of the fact that I put in fins. It's contrary to the patent. And the third reason, and we discussed this in our brief as well, is this. If you are going to look at the development process and what went into that jack on account of the fact that it had fins in it, you are importing into that apparatus claim a question about the development, which is a process limitation. In other words, they are saying, if the fins are the last thing that goes into the jack, you can do the test at ADC set. But if I put the fins in, and then I make some changes after that, then if you're going to test the jack, you've got to do a different test. You've got to take the fins out, and you've got to take all the other stuff out. They're saying that's a different test. They are reading into that patent, into those claims, a process limitation that's dependent upon their development process. That's improper as a matter of law. And no reasonable juror could accept that. Now, let's see. Mr. Nelson, you've used pretty much all of your rebuttal time, your five minutes. But you had a number of questions from all the members of the panel. So we'll restore your full five minutes for rebuttal. Thank you very much. And we'll hear from Switchcraft now. Mr. Howarth, do I have the name correct? You do. Thank you very much, Your Honor. Don Howarth and Suzelle Smith for the appellee and defendant Switchcraft. The first principal point and the one that counsel started with and that the court asked about is the scope of the patent. The cases that are cited by the appellant here are not cases that say that the proper test to be applied is always a question of law. What they say is that the court has to construe the patent and the claims of the patent. There are process patents and so forth where tests are provided for in the patent. Here, the patent, which appears at page A57 et al of the record, and specifically the section that was referred to by Mr. Carlson at column 9, lines 8 through 20 or so, and the accompanying figure 26, do not, do not by any reading set out a test that was patented. The patent here was on a device. The patent here was on fins that provided impedance matching. Right. So wouldn't it be logical to say that if you determine, how to determine if the fins improve impedance matching is to evaluate them with the fins and without the fins? Isn't that follow logically? It certainly would. And that is the second point here is that even the patent doesn't provide a test. It doesn't provide a test. But if it had, it would not be the test that the plaintiff did here. And that was the criticism of the test is that the projections are the fins in the center of this box or jack. At the bottom, those fins fit into slots, which are created for the fins and for no other purpose. If the fins alone were taken off, that is to say, if they were shaved off at the bottom and at the top, that would have been an appropriate test. They were shaved off at the top and pulled out of the hole or the slots at the bottom. When they did that, that created air in the place that was previously filled. In other words, the fins formed a part of the base of the jack. The proper test and the criticism of the test that was made, and which was a question of fact here at trial, without regard to what we put on. We put on the fins actually hurt the impedance matching here. But we also criticized their test to say it did not properly isolate on the fins. It took out fins. And by doing that, it created new slots, which were not in the commercial product. There were no open slots in the commercial product. When they took the fins out, they might have taken them out from the top too and left holes where the fins went through the top. So what was the test you were proposing to account for that? Well, we did several tests to account for that. But we did a test that filled or eliminated the slots at the bottom and took out the fins. And therefore, you had the printed circuit board without fins and in all other ways like the commercial product. That is to say... What were you comparing it to? To the commercial product. Fins and no slots. That's right. You always start with the commercial product. And what they did was they compared the commercial product to fins and slots. We compared it to the commercial product with no fins and no slots because there were no slots in the commercial product. Excuse me, Mr. Huth. No hugging either, by the way. No, excuse me for jumping in on you because time is limited here. Yeah. But I thought the other side was making the argument. I understand your argument as to the deficiencies in their tests. You've discussed this with Judge Prost. But I thought there was a problem with your testing in that it was of your devices, the other side of the picture here, in that prototypes were used. The TX model is the accused device, correct? Right. That's right. And by the way, the TZ was the substitute model. It did not use fins at all, but it controlled for all of the return loss by slots. So slots clearly are a confounding variable here. They do have an effect. They made that criticism of us. It is not accurate. What we did was we compared the commercial product to a product that was a prototype that we used because it had no slots in the bottom. In other words, it was exactly the right comparison, no fins and no slots. I think our test proved to the jury that the fins here did not impedance match. But if you throw out our test, I think as your question illustrated earlier, the finding here wasn't that the defendant proved something. The finding was the plaintiff had failed in its burden of proving that the fins here were for impedance matching or had that effect. Therefore, you could eliminate all of our tests completely from the evidence, and we could have stood on the criticisms that we made of their test, that they did have the confounding variable of open slots, which do not appear in the commercial product. So that either way, there is room for the jury to find that our tests were correct and that the slots actually helped another problem cross talk, like on cell phones, but hurt as to this problem. Jury could have believed that, and you'd have to sustain the verdict. Or they could believe, as the finding of the judge on the JMOL was, that they had failed in their burden of proof. So for each of those reasons, and because the patent is not on the test, you should affirm the court below. Am I at the end of my time? It looks like it. No, you have about nine minutes and 10 seconds. If you finish, that's fine, but you have another nine minutes. Let me then just finish with this. Let me review, just to put it in context, that there are then five separate reasons why the court, some or all of which, why the court should affirm the judgment below. The first is that, as we've discussed, that this is not a patent on a particular test. It does not mandate a particular test. It simply gives an illustration. It's no part of the claims. Second, if it did that, then the test would not be the ADC test, because the ADC test did not compare the product with the fins being absent only. It compared the product with the fins absent, and by the method it used, it exposed new slots, which we know by the TZ, and which they acknowledge in their reply brief, do impact the return loss. So they had open slots, uncontrolled, and Mr. Nixon, their expert, discussed that, admitted that, and we've cited that. So it would not be their test if it did have a particular test. The third reason the court should affirm it is that whether or not a structure within a JAC improves return loss is quintessentially a question of fact, as the trial court below urged. He said it was two ways, as he ruled. He said it was two ways of looking at the same problem, and that's consistent with the case law we cited, for example, to Kemen's case, which says that Kemen food is on page 26 of our brief, that whether a product falls within the scope of a patent properly construed is a question of fact. And that was the sole issue here for the jury on liability, on infringement. Did this product, our product, the switchcraft product, fall within it or not? And plaintiff had the burden of proof on that. The third reason, it seems to me, that the court should affirm is that on this issue of fact, the jury was entitled to believe our testimony, which said that in the printed circuit board JAC, a very different kind of JAC than their JAC, in that JAC, the fins or projections actually hurt the return loss, and they helped this other problem of crosstalk. The jury could have accepted that. Alternatively, for B, if you will, if it did not accept that, it could have accepted our criticisms of their test and found that plaintiff had not met its burden of proving that its test had properly isolated on the projections alone and had confounded it with the creation or the opening up of slots which do not appear in an open form in the commercial product. And then finally, we urge that as the trial judge, Judge Schiltz, disagreed with the claim construction here, and we urge that as an alternative basis that the court could look back at the claim construction. And in language here, in the language from the patent itself, Judge Schiltz, by the way, says he disagreed with Judge Montgomery's construction. That's at page 34 of our brief. The language is that the projections have to be positioned to provide, positioned to provide impedance matching, that is, put there for a particular purpose. That sounds like language that involves intent or purpose. And intent or purpose, unlike their argument in their brief, can, of course, be objectively determined. But what it would leave room for here is exactly what occurred in this case, fins being put in for a different purpose, a crosstalk purpose. And if the jury were to believe they had some incidental effect on the issue of impedance, that would be permissible under this patent properly construed. Because there was testimony that when you take one of these devices and you tune it or optimize it, you have reached a local mountain peak. You have got the best jack you can, given all of the factors that go into one of these jacks. And therefore, any move away from that, I'm not saying it's the best in the universe. It's not the highest peak. But it's the best for what it is. It's optimized. Any move away from that local mountain peak is a move downward. Things will decline because you're moving away from it. The judge used the example of legs on a cabinet. I like the one the expert used at trial where he said if you consider a cathedral or a musical and you wanted to make the sound quality as good as possible, you might use tiles or baffles and you'd put them up to optimize the sound quality. If after doing that, you took out, for example, a balcony for reasons having to do with the fire code, the sound quality would decline. But it would not be because the balcony was there to improve or having the effect of improving the sound quality. It was because that was optimized and built around that. And that was the scientific and heavily debated scientific problem with what the plaintiff used as their simple test. When you optimize a jack that is designed to maximize all of these things, a move away from it, if I punch a hole in the jack, it will cause the return loss performance to decline. It doesn't mean that punching the hole is a patented feature. So any expansion as they're urging to read that the test is a part of the patent would expand this to include all ribs or features in a jack because any rib or feature in an That's why the test is not properly a part of the patent. We argue alternatively that the patent was improperly construed, would agree with Judge Schiltz that it should have been construed to have a factor of intent. Mr. Carlson acknowledged that's cited at page 35 of our brief, that if that's the proper construction, there's no way they can win on that construction because there was no intent to address a different kind of problem. So for all of those reasons, we would ask the court to affirm what was a very thorough and careful job by the judge below. Thank you very much. Thank you, Mr. Howard. We'll hear from Mr. Carlson on rebuttal. As I said, Mr. Carlson, you have your full five minutes of rebuttal if you need it to respond to what Mr. Howard said. Okay, I want to be certain about one thing and that is that this criticism that they made of our test, that it should have been different, was not a test that they ran or that we ran for the jury. This idea that you test the TX against the TX jack with the fins removed and the slots removed and anything else that was there on account of the fins, that wasn't tested. The jury didn't see any evidence that the party said this proves non-infringement. And the reason they didn't see that testing is because going into the trial, it was not identified as an issue about what test to use. And the test that they were proposing was a different test. It was these early development products. So this came out of the final argument. Mr. Carlson, isn't it correct, though, that the evidence that you presented at trial showing the graphs was based on your testing that you had done or your expert had done? Yes, on our testing that tested the TX jack with the fins versus the TX jack without the fins. I gathered from reading the trial transcript, or not all of it, but part of it, I gathered their argument was, okay, but that testing was defective because? Because we didn't fill in the slots. But I just want to point out. You're saying there was no actual testing done in the courtroom? No testing was done of that test with the slots filled in by anybody. It's just that what we're dealing with here is competing expert testimony on this point. Well, we're dealing with what the patent would require that is tested, in our opinion. It was a matter of claim construction. No, but I'm talking just on the slots issue. That's a question of expert testimony. It's a question of what the patent would say you ought to do in the context of that device. How do you test the patent to decide if something infringes it? That would be a legal issue. But factually, I just wanted to point out that this test that they say should have been done by us was not done by us or by them. It was an argument that they came up with. Then just clear me up because, I mean, there were exhibits. There were defendant exhibits, were there not, that showed the differences? No. Showed that there were defendants exhibits that tested two jacks that were early in their development process. Before they changed the fins, they changed the height of the fins, the number, and the thickness. They ultimately changed the fins compared to the one jacks or the two jacks that they offered up to prove their point. The next point I would like to make is that this optimization that he talks about only goes to prove that the fins are helping. If you take out the fins and the return loss goes down, what you've established is that the fins are helping the impedance matching the return loss. His admission that it's optimized is essentially an admission that those fins are in there and they're helping. That's what the case was about. That's what the patent is about. The patent teaches putting fins in there to help the return loss. I feel glasses help me to see if I'm looking up close at something. If I want to know if these glasses are helping, I look at this with my glasses and I keep the paper the same distance away and I look at it without the glasses. By golly, the glasses help. I don't change the location of the paper. I can't change anything else besides testing with my glasses and without. That's what we did in this case. That's what the patent said you should do. Thank you very much. Thank you, Mr. Carlson. The case is submitted.